# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**TRACY FONSECA,**

     **Plaintiff,**

**v.**                                  **Case No.  8:17-cv-568-T-30TGW**

**FERMAN MOTOR CAR COMPANY, INC.,**

     **Defendant.**

_____/

## ORDER

This cause comes before the Court upon the parties' motions for summary judgment (Dkts. 48, 50) and their respective responses in opposition (Dkts. 54, 56).  Upon review of these filings, the record evidence, and upon being otherwise advised in the premises, the Court concludes that Plaintiff's motion should be denied and Defendant's motion should be denied in part and granted in part.

## INTRODUCTION

Plaintiff Tracy Fonseca alleges that her former employer Defendant Ferman Motor Car Company, Inc. violated the Equal Pay Act and the Florida Whistleblower Act.  Both parties believe they are entitled to summary judgment on Plaintiff's claim under the Equal Pay Act but the record reflects a genuine issue for trial on whether the pay differentials between Plaintiff and her male co-workers were based on a factor other than sex.

Defendant also moves for summary judgment on Plaintiff's Florida Whistleblower Act claim. The Court grants judgment in Defendant's favor on this claim because most of Plaintiff's objections—other than her complaints about her pay—were not about a violation of law. With respect to Plaintiff's objections about her unequal pay, Plaintiff has not established pretext, i.e., that the real reason for her termination was due to her unequal pay complaints.

## BACKGROUND

In January 2016, Plaintiff Tracy Fonseca began her employment at Defendant Ferman Motor Car Company, Inc. in the position of service advisor at the Ferman Buick-GMC dealership, located in Lutz, Florida. Ferman Buick-GMC ("Ferman") is a new car dealership that sells and services vehicles. As part of its operations, Ferman employs service advisors who work with a team of technicians to perform service repair work. The service advisors and technicians are managed by a service manager. The service advisors' duties include writing customer repair orders/tickets ("ROs"), selling repair work, providing assistance to customers, and finalizing work orders. Service advisors are responsible for all gross service and parts sales and maintaining customer satisfaction index ("CSI") levels at or above region.

Service advisors are compensated pursuant to a pay plan. Included in the plan is a commission schedule based on benchmarks for certain services and parts sold by the service advisors and department. The pay plan includes a monthly bonus if the three month rolling CSI score for service advisors as a group is above region. Plaintiff agreed to a pay plan that provided: a commission schedule of 15% on the first $10,000 gross service written, 4.5% for

additional service labor above the initial $10,000, 3% for all parts gross written, and 0.3% for total combined Buick-GMC parts and service department gross. Plaintiff was also entitled to a $750 monthly bonus if the three month rolling CSI score was above region.

Once certain services were completed for a Ferman customer, a third party for General Motors ("GM") or Buick provided the customer with a CSI form to complete. Ferman received a copy of the CSI scores. Maintaining CSI above region is an essential function of the service advisor position.

When Plaintiff began her employment in January 2016, Bob Cooper was the service manager. In March 2016, Ron Scott replaced Cooper. Plaintiff testified during her deposition that her claims in this case relate to the time that Scott was the service manager. Scott hired two male service advisors, Matthew Keith and Ty Robinson, in July 2016, and August 2016, respectively. Plaintiff, Keith, and Robinson were the only service advisors during the relevant time. The record reflects that Plaintiff, Keith, and Robinson executed the same pay plan.[1] However, when Scott hired Keith and Robinson, he made the business decision to provide them with supplemental "training pay," i.e., a guarantee of a minimum dollar amount, while Keith and Robinson learned Ferman's systems.

With respect to Keith, Scott agreed that if Keith made less than $5,000 under the pay plan, he received the difference in training pay. With respect to Robinson, if Robinson made less than $4,000 a month, Scott would pay him the difference in training pay. Scott admitted

---

[1] In August 9, 2016, Plaintiff executed a new pay plan to reflect a 4.75% commission for additional service labor above $10,000 to be consistent with the other service advisors' pay plans.

that he did not provide Plaintiff training pay because she had a full team of four technicians and was familiar with Ferman's systems. Scott testified during his deposition that the training pay to Keith and Robinson was pursuant to a handshake deal and to secure their employment. The training pay was charged to Ferman's General Ledger account.

Kimberly Wright, Ferman's Human Resources ("HR") Director at the time had "no idea" why the male service advisors were awarded this additional compensation. Wright testified that training pay is when the service advisor is required to go or do training at the store level; it is when the employee is "pulled away from work," for a required course or to complete "certain certifications." The record is undisputed that Keith and Robinson did not attend training during the relevant time.

Because Keith and Robinson were being compensated the additional training pay, they ended up making more money than what was provided for in their pay plans. As reflected in the below chart, (Dkt. 50 at 5), Keith and Robinson were also making more than Plaintiff for several months, despite the fact that her production was always higher.

|  | MS. FONSECA (Began 1/16) | MR. KEITH (Began 7/15/16) | MR. ROBINSON (Began 8/23/16) |
|---|---|---|---|
| July Per Pay Plan | $3,864.00 | $2,158.00 |  |
| July Training Pay | 0 | $ 900.00 |  |
| Aug. Per Pay Plan | $3,751.00 | $3,359.00 | $ 18.00 |
| Aug. Training Pay | 0 | $1,641.00 | $1,092.00 |
| Sept. Per Pay Plan | $4,001.00 | $3,459.00 | $2,458.00 |
| Sept. Training Pay | 0 | $1,541.00 | $1,542.00 |
| Oct. Per Pay Plan | $4,036.00 | $3,675.00 | $2,819.00 |
| Oct. Training Pay | 0 | $1,325.00 | $1,181.00 |
| Nov. Per Pay Plan | $4,435.00 | $3,807.00 | $2,848.00 |
| Nov. Training Pay | 0 | $1,193.00 | $1,152.00 |
| Dec. Pay Per Plan | $3,309.00 | $3,305.00 | $2,787.00 |
| Dec. Training Pay | 0 | $1,387.00 | $1,192.00 |

Scott testified that Plaintiff's performance was "very good." When Plaintiff complained to Scott about the disparity in pay, Scott claimed that the training pay was a "one time" deal and that "moving forward" Plaintiff would be on the same pay plan. The record reflects that the additional training pay to Keith and Robinson continued for six months and five months, respectively. Scott admitted during his deposition that he did not discuss the training pay he gave to Keith and Robinson with HR.

According to Plaintiff, she complained constantly to Scott about the pay disparity. The record reflects that Plaintiff, Keith, and Robinson performed the same work and had the same job requirements. They also worked the same hours.

Plaintiff testified that she also complained to Scott about what she believed were violations of the law. According to Plaintiff, Ferman was engaged in "consumer fraud" and warranty fraud. She testified during her deposition that in June 2016, Darlene Davis-Lloyd brought her vehicle in for water damage and windshield leaks. Plaintiff claims that her technician told her the repairs could not be done under warranty because the windshield had previously been replaced. The record reflects that it is ultimately Scott's decision to determine whether repairs are covered under warranty. Even if the repairs are not made under warranty, Scott can cover the repairs under "customer enthusiasm," which GM supports.

Scott concluded that the repairs for Davis-Lloyd's vehicle were covered under warranty. The warranty repair ticket was closed by GM in August 2016. GM did not challenge the warranty designation.

Plaintiff also claims in this case that Davis-Lloyd's vehicle was fraudulently sold to Davis-Lloyd as new when it had really been a demo car and previously damaged. The Court will not go into any additional detail on this claim because the record reflects that Plaintiff was not employed at the time of the vehicle's sale and has no personal knowledge of that transaction or any violation of law.

Plaintiff testified that there were forged ROs written in her name. The record reflects that Ferman employed Kent Gable as a service director during the relevant time. In that capacity, Gable helped the service advisors with assisting customers. If a service advisor was away from her desk or busy with a customer, part of Gable's duties included writing the RO

in the service advisor's name so her technicians would handle the repair matter. It was then the service advisor's responsibility to follow-up with the customer. Because her name was on the RO, Plaintiff would receive the commissions on the transaction and any CSI score would be attributed to her. This was true for all of the service advisors.

If Gable was unavailable, the other service advisors were permitted to write an RO in Plaintiff's name if a customer arrived when she was unavailable. At the time the RO is written, the service advisor would not know if that customer planned on completing a CSI survey.

Plaintiff claims that her signature was allegedly "forged" on ROs. She claims that this resulted in her having negative CSIs, but during her deposition she could not say how much of an impact the "forged" ROs impacted her CSIs. Plaintiff admitted that she received a commission for the work performed on any RO assigned to her.

Plaintiff claims that Scott wanted her to participate in warranty fraud for Plaintiff's vehicle. The record does not reflect any evidence that Ferman committed warranty fraud with respect to Plaintiff's vehicle or any other vehicle.[2]

It is undisputed that Plaintiff's CSI numbers were some of the lowest in the company, which impacted the dealership, its managers, and other employees. Luke Miller, the general

---

[2] Plaintiff's response to Defendant's motion for summary judgment largely throws out selfserving "facts" that she believes establishes that Defendant committed consumer fraud, warranty fraud, and the crime of forgery. As discussed in more detail under the discussion of the Florida Whistleblower Act claim, the record does not establish any genuine issues for trial on these claims because all of the "facts" are based on Plaintiff's suspicions. In other words, there is no evidence establishing that Defendant actually committed any of these violations of the law.

manager of sales who is over Scott and the service department, testified that managers will be replaced if they cannot ensure the dealership's CSI is above region. Plaintiff acknowledged her low CSI numbers. She attributed them to multiple causes, including the fact that she wrote more ROs than others, she received more problem vehicles due to her team's expertise, and her team did not provide timely updates on ROs written in her name. Plaintiff also testified that her poor CSI scores were related to the fact that others were writing ROs in her name.

On January 19, 2017, Plaintiff requested a meeting with Miller. At the advice of HR, Miller had Scott present at the meeting since he was Plaintiff's direct supervisor. Neither Miller nor Scott were planning on terminating Plaintiff at this time. Unbeknownst to Miller and Scott, Plaintiff recorded their meeting on her cell phone. The transcript of Plaintiff's recording of this meeting reflects that Plaintiff, Miller, and Scott discussed her poor CSI scores. Plaintiff acknowledged that her CSI numbers were low. Plaintiff told Miller that she wanted to transfer to a non-CSI based position and had talked to Chris Shrewsbury about a position at Ferman's Body Shop. The record reflects that Plaintiff expressed to Miller and Scott that the service advisor position was not a good fit for her due to the CSI expectations. Miller said he would accept Plaintiff's resignation and would allow her to apply anywhere in Ferman with no break in service. Otherwise, Plaintiff would have to improve her CSI. Plaintiff then told Miller that she could not resign until she secured a new position because she was the only person in her family who was working at that time.

At the conclusion of the meeting, Miller believed that Plaintiff decided against resigning in order to stay in her current position while she looked to see whether there were transfer options to another Ferman position. Miller stated that, to his surprise, Plaintiff subsequently resigned.

Plaintiff claims she was terminated at the January 19, 2017 meeting. Plaintiff's Separation Notice dated January 23, 2017, reflects that Plaintiff was "ineligible for rehire" and that Plaintiff voluntarily quit because she "no longer wanted to do advisor job." The record is completely unclear on whether Plaintiff was terminated or whether she resigned so the Court will interpret this conflict in Plaintiff's favor and assume that Plaintiff was terminated for the purpose of the summary judgment analysis.

On January 23, 2017, Scott hired Jim Hindman to replace Plaintiff. Scott gave Hindman $600 in "training pay" as additional compensation.

On March 8, 2017, Plaintiff filed her complaint in this case, alleging a violation of the Equal Pay Act in Count I and a violation of the Florida Whistleblower Act in Count II.

## SUMMARY JUDGMENT STANDARD

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be

no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)(emphasis in original).  The substantive law applicable to the claimed causes of action will identify which facts are material.  *Id.*  Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in his or her favor.  *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial.  *Chelates*, 477 U.S. at 324.  The evidence must be significantly probative to support the claims.  *Anderson*, 477 U.S. at 248-49.  This Court may not decide a genuine factual dispute at the summary judgment stage.  *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990).  "[I]f factual issues are present, the Court must deny the motion and proceed to trial."  *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983).

A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990).  However, there must exist a conflict in substantial evidence to pose a question for the fact finder.  *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## DISCUSSION

### I.  Equal Pay Act

"A plaintiff establishes a prima facie case under the Equal Pay Act if she shows that her employer paid 'different wages to employees of opposite sexes for equal work on jobs requiring equal skill, effort, and responsibility, and which [we]re performed under similar working conditions.'" *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1362–63 (11th Cir. 2018) (quoting *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995) (internal quotation marks omitted)).  Once a plaintiff makes such a showing, the employer can avoid liability only if it proves by a preponderance of the evidence that the wage differential was justified by "a seniority system," "a merit system," "a system which measures earnings by quantity or quality of production," or some "factor other than sex."  *See id.* (internal quotation marks omitted).  As the Eleventh Circuit recently noted, proving this affirmative defense can be difficult; the employer's "burden is a heavy one."  *Id.* (internal quotation marks omitted).

"The employer must show that the factor of sex provided no basis for the wage differential."  *Id.* (internal quotation marks omitted).  "Further, the employer must show that none of the decision-makers, whether in middle or upper management, were influenced by [sex] bias."  *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1078 (11th Cir. 2003).  If the employer satisfies its burden, the plaintiff must offer evidence showing that the employer's nondiscriminatory reason for the wage differential is pretext.  *See Irby*, 44 F.3d at 954.

Plaintiff is entitled to proceed to trial on her Equal Pay Act claim.  She has established a prima facie case by pointing to the pay disparity between her and the other male service

advisors. Although Ferman claims a nondiscriminatory reason for the disparity, i.e., that the male service advisors were entitled to training pay in order to establish their teams and learn Ferman's systems, a jury could find that Ferman "has failed to satisfy its heavy burden of showing that sex provided no basis for the disparity." *Bowen*, 882 F.3d at 1363. Plaintiff has established pretext because Scott's reasons for the pay disparity are inconsistent in the record. For example, Scott claimed that the training pay was a one time deal but continued to pay the additional compensation to the male service advisors for months. And the record reflects that the male service advisors did not perform any actual training to substantiate the additional compensation. Moreover, Scott replaced Plaintiff with Hindman, a male, and paid him training pay.

Of course, a jury could also find based on this record that sex had nothing to do with the pay disparity. Accordingly, summary judgment is not appropriate in either party's favor and this claim will proceed to trial.

## II.     Violation of the Florida Whistleblower Act

The Florida Whistleblower Act ("FWA"), Fla. Stat. 448.102, prohibits employers from taking retaliatory action against their employees for reporting violations of laws, rules, or regulations. The statute provides:

> An employer may not take any retaliatory personnel action against an employee because the employee has:
>
> (1) Disclosed, or threatened to disclose, to any appropriate governmental agency, under oath, in writing, an activity, policy, or practice of the employer that *is in violation of a law, rule, or regulation.* However, this subsection does not apply unless the employee has, in writing, brought the activity, policy, or

practice to the attention of a supervisor or the employer and has afforded the employer a reasonable opportunity to correct the activity, policy, or practice.

(2) Provided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer.

(3) Objected to, or refused to participate in, any activity, policy, or practice of the employer which *is in violation of a law, rule, or regulation.*

Fla. Stat. § 448.102 (emphasis added).

In the Eleventh Circuit, courts apply the same burden shifting framework used in Title VII retaliation cases to claims under the FWA. *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000). That is, an employee must first make a prima facie showing of retaliation. As with a Title VII retaliation claim, an employee can establish the prima facie case by showing that (1) she engaged in statutorily protected activity, (2) she was subjected to adverse employment action, and (3) there was a causal connection between the events. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If the employee can meet these elements, the burden then shifts to the employer to articulate a non-retaliatory reason for its action. *Id.* If the employer can present a non-retaliatory reason, the burden then shifts back the employee to show that the employer's reason is pretext. *Id.*

Notably, the FWA's requirement that an employer's policy be "in violation of a law" is "unequivocal." *Graddy v. Wal-Mart Stores E., LP*, 237 F. Supp. 3d 1223, 1227–28 (M.D. Fla. 2017). The FWA does not provide protection to employees for "alleged" or "suspected" violations of the law. *Id.*

Ferman is entitled to summary judgment on Plaintiff's FWA claim for several reasons. First, for all of the claims except the claim that Ferman violated the Equal Pay Act, Plaintiff has not established that she engaged in FWA protected activity. In Plaintiff's opinion, Ferman committed consumer fraud, warranty fraud, and forgery, but these purported violations are not established in the record. These are the types of "suspected" violations of the law that are insufficient.

Second, Plaintiff has not established a causal connection, that is, that any alleged protected activity is causally connected to her alleged termination.

Third, even if the Court were to assume that Plaintiff established a prima facie case under the FWA for all of her claims, including her claim that Defendant violated the Equal Pay Act, Plaintiff provided no evidence of pretext. Although the circumstances surrounding Plaintiff's termination may be unclear in the record, there is simply no evidence showing that Plaintiff's complaints about Ferman violating a law had anything to do with the real reason behind her termination. Indeed, the transcript of Plaintiff's clandestine recording of the meeting where she claims Miller and Scott terminated her does not reveal any reference to unequal pay or any other violation of law. The transcript reflects that Plaintiff, Miller, and Scott discussed in great detail Plaintiff's low CSI, which is consistent with Ferman's legitimate, non-discriminatory reason for Plaintiff's termination.

Plaintiff does not provide enough evidence to permit a reasonable fact finder to conclude that her low CSI was not the real reason for her termination. *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1528 (11th Cir. Ala. 1997). And the law is clear

that an employee's own evaluation and opinion is not a sufficient basis to establish pretext.

*Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1332-1333 (11th Cir. Ga. 1998). Accordingly, Defendant is entitled to summary judgment on Plaintiff's FWA claim.

It is therefore ORDERED AND ADJUDGED that:

1. Defendant's Motion for Summary Judgment (Dkt. 48) is denied in part and granted in part.

2. Plaintiff's Motion for Summary Judgment (Dkt. 50) is denied.

3. This case will proceed to trial on Plaintiff's claim under the Equal Pay Act. The Court defers entering judgment in Defendant's favor on Plaintiff's FWA claim until the conclusion of this case.

**DONE** and **ORDERED** in Tampa, Florida on July 27, 2018.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**

Counsel/Parties of Record